**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 7-CR-244** |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **MICHAEL A. SPICER,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

## OPINION AND ORDER

## I. INTRODUCTION

This matter is before the Court on remand from the Sixth Circuit, where a panel of judges held that this Court improperly denied a Motion to Suppress Physical Evidence, (Doc. 30), by Defendant Michael A. Spicer ("Defendant" or "Spicer") when it did so on the grounds that the private search doctrine permitted officers to search Spicer's room without a warrant. *See United States v. Spicer*, No. 10-3401, 432 F. App'x 522, 523–24 (6th Cir. Aug. 2, 2011). This Circuit held that the private search doctrine does not extend to residential searches, and vacated and remanded this Court's Opinion and Order and directed this Court to examine "other exceptions to the Fourth Amendment warrant requirement." *Id.* at 524. This Court now **DENIES** Defendant's Motion to Suppress Physical Evidence on different grounds.

## II. BACKGROUND

### A. Factual History[1]

On Wednesday, July 25, 2007 at 9:12 p.m., Spicer checked into room 249 at the Courtyard-Marriott Hotel, Columbus Airport location ("Marriott"). Spicer paid for the room in cash and also deposited an extra $100, as was required by the Marriott for guests paying cash. In the event of a violation of Marriott's non-smoking policy, the deposit would be retained by the hotel.

On the morning of July 26th, Spicer exited his room, leaving it unoccupied and locked. His personal belongings remained in the room. Spicer claims that due to the hotel's smoking policy, he went into his car, which was parked in the hotel parking lot, to smoke. While in the parking lot, Spicer met a hotel employee, and they began smoking a blunt (marijuana cigarette) together. At the suppression hearing, Spicer testified that he did not smoke anything in the hotel room.

While Spicer was out of his room taking his smoking break, a hotel housekeeper, Nicole Shaw, went to room 249 to clean. The room was marked "vacant and dirty" on her assignment sheet, and, as a result, she believed the room to be vacant at the time she entered. When she entered the room, she smelled smoke immediately and observed what she believed to be marijuana residue. The record is inconsistent as to whether she smelled cigarette smoke or marijuana smoke. Regardless, she believed she smelled smoke, and smoking any substance is a violation of the Marriott's non-smoking policy. Shaw contacted her supervisor who instructed her to notify the front desk about the smoking violation. There is some inconsistency as to

---

[1] The facts are taken in large part from this Court's prior Opinion and Order on Defendant's Motion to Suppress Physical Evidence. *United States v. Spicer,* No. 2:07-cr-00244, 2009 WL 499526, at *1–3 (S.D. Ohio Feb. 25, 2009). The Sixth Circuit's mandate did not find any clear error in our previous findings of fact. *See Spicer*, 432 F. App'x at 522.

whether Shaw or another housekeeper notified the front desk of the smoking violation, but the front desk was notified nevertheless. From the testimony, it appears that Shaw contacted the Human Resources and Accounting Supervisor, Delmeka Richardson, but another housekeeper also contacted the front desk and notified the Assistant Manager, Quinn Miller.

Richardson and Miller took the hotel digital camera and went to room 249 to document the smoking infraction. Believing the room to be vacated, Richardson used his Assistant Manager's key to enter the room. When Richardson and Miller entered the room, they both saw cigarettes on one of the beds and debris on the floor between the beds. Richardson thought it appeared to be cigar shellings. Miller thought it appeared to be brown colored debris and marijuana buds. Their observations were confirmed by Spicer's own testimony because he admitted at the hearing that he had tried to dump the remains of his blunt shell into the trash can, but some fell out onto the floor. Richardson smelled smoke, but does not know if it was tobacco or marijuana smoke. Miller could not recall smelling smoke. They took three photographs: one of the cigarettes, one of the blunt shells on the floor, and one of a lighter that was on the bed.

Upon further examination, Miller saw a shirt and cell phone lying on one of the beds, but did not see any other clothing or luggage in the open. He did a sweep of the room to find if anything else had been left behind by the guest, as he believed the guest had checked out. He pulled out the desk chair and found a black backpack on the chair. At that point, he still believed the guest had checked out, and that the backpack had been overlooked, as it was on a desk chair pushed under the desk. He planned on taking the backpack to lost-and-found. He unzipped the backpack to check for identification and instead saw objects wrapped in cellophane inside the bag. He turned to Richardson, showed her the inside of the bag, and told her there might be an issue. They both thought the cellophane-wrapped objects contained illegal substances. Miller

asked Richardson to contact the front desk to notify the General Manager and to contact the police. He then returned the backpack to the chair. He does not recall zipping up the bag.

After having been notified of what was found in room 249, the General Manager, Lamarr Barr, informed Richardson that he would re-key the room to secure it and lock all hotel guests out. Richardson and Barr both believed the Marriott had the authority to evict a guest for illegal conduct. Barr and the Chief Engineer went to inspect further and confiscate the room. Upon arriving at the room, Barr swiped his card through the lock, believing that he had re-keyed it. While in the room, Barr testified that he observed tobacco shell casings and green stems on the floor around the trash can between the two beds and smelled marijuana smoke. He also observed the unzipped backpack and could see the wrapped objects inside. He believed the objects contained drugs. Barr and the Chief Engineer exited the room and thought the room was secure when the door locked behind them.

Two Columbus police officers, one of whom was Officer Laura Evans ("Officer Evans"), arrived first at the Marriott approximately ten minutes after they were called. The officers had received a dispatch that someone had checked out of a hotel room and the hotel staff had found a bag full of what they believed was narcotics. Barr and the Chief Engineer met the officers in the lobby landing area. Barr informed the officers that the smoking policy had been violated, that he had re-keyed the room, and retaken possession of the room. Everyone then proceeded to the room.

Barr swiped his key and pushed open the door to room 249. Before it had completely opened, the door was pushed shut from the other side by Spicer. Barr was surprised to find someone pushing the door back at him because he thought he had re-keyed the room. Barr informed Spicer he was the General Manager. One of the officers then either asked or demanded

Spicer come out of the room. According to Officer Evans and Barr, they requested Spicer exit the room, but according to Spicer it was demanded. Regardless, Spicer came out into the hall, closing the door behind him. Barr informed him about the hotel smoking policy, but Spicer explained he had just been smoking a blunt. According to Officer Evans, Barr, and another hotel employer, Spicer stated he had just been smoking a blunt. According to Spicer, he informed them he had been smoking a blunt in the parking lot with a hotel employee, but that he had not been smoking in his room at all. Spicer, however, did not testify that he had not rolled and prepared the blunt in the room.

The officers and Spicer waited outside the door for the detectives (narcotics officers) to show up. Spicer was not permitted to reenter the room. At this point, he was being detained, though he had not yet been arrested. From the evidence, it appears the detectives John Dozer ("Detective Dozer") and Jerry Peters ("Detective Peters"), (collectively referred to as "Detectives"), from the multi-jurisdictional federal task force in Columbus, Franklin County, Ohio, arrived about ten minutes later. Spicer asserts he waited for at least 30 minutes. Every other person, however, testified it was about ten minutes. When the Detectives arrived, Miller informed them he had seen a bag inside room 249 that he believed contained narcotics. Barr informed them about the situation and told them he had also seen a bag inside room 249 that he believed contained narcotics. He told the Detectives he would take them up to the room and show them what had been found. Barr took the Detectives to room 249, used his master key to open the room, and they followed him inside.

According to Detective Dozer, they entered the room to secure the room before getting a warrant because they would not leave officers stationed outside of the room until they have ensured that no one else is hiding in the room. Detective Dozer asserted that this was done as a

5

safety precaution prior to obtaining a warrant. Detective Dozer testified that: "We just went in, took a quick look in the bathroom and checked under the beds and just made sure that there was no other individuals in there that possibly the hotel employees had missed when they were in there." (Doc. 57, p.7.) According to the Detectives and Barr, they were in the room for two minutes at most.

Barr and Detective Dozer testified that the Detectives did not move or touch any of the objects in the room. Detective Dozer testified that he saw the backpack in plain view in the desk chair with what appeared to be approximately three kilograms of cocaine inside. He also testified he could smell cigarette and marijuana smoke and saw tobacco shavings on the floor. Detective Dozer testified that he did not touch the backpack or unzip it. Spicer asserts, however, that the backpack was zipped when he exited the room.

After sweeping the room, the Detectives and Barr exited. The Detectives left to obtain a search warrant and Spicer was arrested. According to Detective Dozer, it is their policy to obtain a warrant; however, he testified that he believed they had probable cause to search the room even without obtaining the warrant, because they believed Spicer had been evicted and the General Manager had given them consent to enter the room.

Franklin County, Ohio Municipal Court Judge Julia Dorrian signed the warrant, and the Detectives and other task force officers returned to room 249 to execute the warrant. They also obtained a warrant to search Spicer's car. Detective Dozer took pictures of the hotel room and observed the car search. They sent the three cellophane-wrapped, brick-shaped objects found inside the book bag to the lab to be tested. The lab indicated that the bricks were cocaine and weighed 2.970 kilograms.

*B. Procedural History*

After a grand jury indicted Spicer on drug charges, he filed a Motion to Suppress

Physical Evidence.  (Doc. 30.)  A suppression hearing was held on February 18th and 19th of

2008.  (Doc. 55, 56, 57.)  This Court denied Spicer's Motion to Suppress Physical Evidence,

finding that the private search doctrine permitted the officers to search Spicer's room without a

warrant.  *See United States v. Spicer*, No. 2:07-cr-00244, 2009 WL 499526, at *4–5 (S.D. Ohio

Feb. 25, 2009).  Specifically, this Court held that because hotel employees acting as private

individuals, rather than agents of the government, searched the room before the Detectives, under

*United States v. Jacobsen*, the Detectives were allowed to retrace the steps of the private search.

*See id.* (citing 466 U.S. 109, 114–15 (1984) (finding a federal agent's warrantless search of a

suspicious package that had already been opened by employees of a carrier could not be held to

be unreasonable under the Fourth Amendment because the "reasonableness of an official

invasion of the citizen's privacy must be appraised on the basis of facts as they existed at the

time that invasion occurred")).

Spicer appealed this Court's decision, contending that insufficient findings of fact were

made to support the application of the private search doctrine.  *Spicer*, 432 F. App'x at 524.  The

Sixth Circuit vacated this Court's Opinion and Order, but on different grounds.  *Id.*  This Circuit

held that *Jacobsen* did not apply at all because in *United States v. Allen*, "[r]ecognizing the

difference between one's privacy interest in a residence and one's privacy expectation in an

opened parcel, we decline[d] to stretch the private search doctrine to residential searches,

including police searches of hotel rooms premised on private employees' discoveries."  *Id.*

(citing 106 F.3d 695, 698–99 (6th Cir. 1997)).

The Sixth Circuit's mandate to this Court on remand reads as follows:

Of course the district court's misapplication of *Jacobsen* does not end the matter because Spicer's reasonable expectation of privacy may have been properly extinguished through other means. The court could have found, as the Government argued below, that the [General Manager] had divested Spicer of his status as an occupant of the room, entitling the [General Manager] to consent to a police search. . . . Or it could have found, as also argued below, that a protective sweep was warranted because the detectives had a reasonable belief based on specific and articulable facts . . . that the area swept harbored an individual posing a danger. . . .

But the district court expressly declined to address these issues, and the parties accordingly have not briefed them here. As Spicer acknowledges, the court "rest[ed] its decision solely on its application of the private[-]search doctrine and did not make any findings of fact[ ] or conclusions of law relating to any [other] exceptions to the Fourth Amendment warrant requirement." We agree and remand so that it may do so now.

For these reasons, we vacate the district court's order denying Spicer's motion to suppress and remand for further proceedings consistent with this opinion.

*Id.* at 524–25 (alterations in original and internal citations and quotations omitted).

This Court held a telephonic status conference on September 29, 2011, to issue a briefing schedule.  (Doc. 66.)  The parties disagreed about the scope of the Sixth Circuit's remand, and this Court entered an Order directing both parties to "address the scope of the Sixth Circuit's remand in their opening briefs."  (Doc. 67.)  The Government's opening brief was also to include arguments on each issue it believed it was entitled to argue, including: (1) whether Barr, the General Manager, had authority to consent to the police search of the Defendant's room under *Allen*, 106 F.3d 695; (2) whether a protective sweep was warranted under *Maryland v. Buie*, 494 U.S. 325, 327 (1990); (3) the applicability of *Herring v. United States*, 555 U.S. 135 (2009); and (4) the applicability of the inevitable discovery doctrine.  This Court's Order directed Defendant, to include arguments related to issues (1) and (2) in his opening brief, which are the only issues Defendant believes this Court may consider in light of the remand.  Defendant was directed to address issues (3) and (4) in his responsive brief.

The briefs have been filed by the parties and the issues are now ripe for review.

## III. LAW AND ANALYSIS

### A. General or Limited Remand

The first issue this Court must address of is whether the Sixth Circuit's remand was general or limited. The Government argues that none of the four issues listed above was explicitly or impliedly decided by the Sixth Circuit because the Circuit decided precisely one issue only: whether the Detectives' search was justified as a retracing of a private search by hotel employees. The Government also contends that it never waived issues (1) through (4). The Government explicitly raised three of the issues in its response to Defendant's Motion to Suppress Physical Evidence. The remaining issue—the applicability of *Herring*, 555 U.S. 135, which clarifies the limits of the exclusionary rule—was not yet ripe when the Government filed its response because *Herring* had not yet been decided. There is nothing in the Sixth Circuit's Opinion and Order, the Government contends, that limits the scope of the remand. The Government acknowledges that issues (1) and (2) were specifically mentioned in the mandate, but argues that those issues "were merely examples of those 'other means,' [by which Spicer's reasonable expectation of privacy may have been properly extinguished] and did no more than parallel the two issues that been listed as *examples* of issues raised by the case in *this* Court's initial opinion." (Doc. 68) (emphasis in original) (citing *Spicer*, 432 F. App'x at 524).

The Defendant failed to brief the scope of the remand in its opening brief. On reply, Defendant argues that the inevitable discovery doctrine was impliedly decided by the Sixth Circuit because it was raised and not decided at the trial level, but not explicitly remanded back, like the consent and protective sweep issues. Defendant also argues the inevitable discovery doctrine issue is either not ripe or moot depending on how the Court rules on the Government's

arguments related to consent and protective sweep. Defendant makes the same ripeness and

mootness arguments with respect to the exclusionary rule/*Herring* issue.[2]

When determining the scope of an appellate court's remand, the relevant rule is the

mandate rule. The mandate rule has two sub-rules: (1) the limited remand rule, which arises

from action by an appellate court; and (2) the waiver rule, which arises from action (or inaction)

by a party. *United States v. O'Dell*, 320 F.3d 674, 679 (6th Cir. 2003). With respect to the

limited remand rule, compliance is compelled on remand with the dictates of the superior court

and re-litigation of issues expressly or impliedly decided by the appellate court is foreclosed.

*Id.*; *see United States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999) (explaining that

traditionally, the limited remand rule "instructs that the district court is without authority to

expand its inquiry beyond the matters forming the basis of the appellate court's remand"). With

respect to the wavier rule, "where an issue was ripe for review at the time of an initial appeal but

was nonetheless foregone, the mandate rule generally prohibits the district court from reopening

the issue on remand unless the mandate can reasonably be understood as permitting it to do so."

*O'Dell*, 320 F.3d at 679 (citing *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001)).

A court of appeals has broad discretion to issue general and limited remands under 28

U.S.C. § 2106. *See Campbell*, 168 F.3d at 265; *United States v. Moore*, 131 F.3d 595, 597 (6th

Cir. 1997). A limited remand is one that explicitly outlines the issues to be addressed by the

---

[2] Defendant confuses the concept of setting forth multiple arguments and arguing in the alternative, which
the Government has done here on remand, with the doctrines of mootness and ripeness. *See Steele v.
Collins*, Civil Action No. 2:09-cv-00631, 2010 WL 3385068, at *3 (S.D. Ohio Aug. 23, 2010) ("The
doctrine of mootness requires a live case or controversy for a federal court to decide a case.") (citing
*Burke v. Barnes*, 479 U.S. 361, 363 (1987)); *Warshak v. United States,* 532 F.3d 521, 525 (6th Cir. 2008)
(explaining that "the ripeness doctrine serves to avoid premature adjudication of legal questions and to
prevent courts from entangling themselves in abstract debates that may turn out differently in different
settings") (internal citations and quotations omitted). As such this Court finds this argument made by
Defendant unpersuasive.

district court and creates a narrow framework within which a district court must operate.

*Campbell*, 168 F.3d at 265 (citing *Moore*, 131 F.3d at 598 ("[A] limited remand constrains the district court's resentencing authority to the issue or issues remanded.")).  A court of appeals "must convey clearly intent to limit the scope of the district court's review."  *Id.* at 267. Conversely, a general remand allows a district court to "address all matters as long as remaining consistent with the remand."  *Id.*

Relevant language providing clues as to the scope of the remand can appear "anywhere in an opinion or order" but "individual paragraphs and sentences must not be read out of context." *Id.* at 266–67.  Language "must be read with the analysis offered in the opinion" and "context matters."  *O'Dell*, 320 F.3d at 681 (citing *United States v. Santonelli*, 128 F.3d 1233, 1237–38 (8th Cir. 1997)).  Moreover, this Circuit has explained that "to determine whether a remand is limited or general, one should look to the purpose of the rule-encouraging finality and discouraging wasteful litigation-and 'the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces.'"  *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994).

The Sixth Circuit's mandate in this case was general.  This Circuit's directive "remand[ing] for further proceedings consistent with this opinion," does not create the requisite "narrow framework within which a district court must operate" to be considered limited in scope. *See Spicer*, 432 F. App'x at 525; *Campbell*, 168 F.3d at 265; *but see O'Dell*, 320 F.3d at 678 (finding a mandate that instructed the district court to re-sentence the defendant "without application of the safety valve" protection of 18 U.S.C. §§ 3553(f) and U.S.S.G. § 5C1.2 was a limited rather than general order).  The Sixth Circuit does discuss two options by which this Court "could have found" that Spicer's reasonable expectation of privacy was extinguished by

other means—by consent or by a protective sweep—but this Circuit did not purport to limit the remand to those two issues, as it also made the more general observation that "Spicer's reasonable expectation of privacy may have been properly extinguished through other means." *Spicer*, 432 F. App'x at 524. When taken in the context of the entire Opinion and Order, the Sixth Circuit's mandate is an instruction for this Court to consider other exceptions to the Fourth Amendment's warrant requirement.

Moreover, the Sixth Circuit decided one issue only in its Opinion and Order—that the private search doctrine does not extend to residential searches. *Spicer*, 432 F. App'x at 524. Therefore, the four issues raised by the Government on remand are not precluded because they have not yet been decided. *See Rouse v. DaimlerChrsyler Corp. UAW*, 300 F.3d 711, 715 (6th Cir. 2002) (holding the district court abused its discretion when it improperly barred consideration of issues which had never actually been decided). Nor has the Government waived any of the four issues. The first three issues were raised in the Government's response to Spicer's suppression motion, and the fourth issue was not ripe when the Government filed its brief because the Supreme Court had not yet decided *Herring*. *Cf. United States v. Master,* 614 F.3d 236, 243 (6th Cir. 2010) (remanding "for the purposes of re-examining the facts and balancing the interests as required by *Herring*" where a suppression hearing was decided prior to *Herring*).

The Court will now address the parties' arguments related to Defendant's suppression motion.

### B. Defendant's Motion to Suppress

Under the Fourth Amendment's protective veil, a hotel guest has a reasonable expectation of privacy in his or her hotel room, and a warrantless search of the room is

unreasonable unless it falls within an exception to the warrant requirement. *United States v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008). This Court finds at least two such exceptions apply here. Thus, despite this Court's finding above that the Sixth Circuit's remand was general, and the fact that this Court could address all of the Government's arguments if it was necessary, doing so would be superfluous. Defendant's Motion to Suppress Physical Evidence can be disposed of on the grounds that either the Detectives had consent to conduct a search or that the Detectives could conduct a protective sweep.

### 1. Consent to Conduct Search

The first issue the parties were asked to brief in the September 30, 2011 Order was whether the General Manager had the authority to consent to the search of the Defendant's room by the Detectives under *Allen*, 106 F.3d 695. (Doc. 67.) The Government concedes that as a general matter, hotel management does not have authority to consent to the search of a hotel room, but argues that under *Allen*, once a hotel guest's rental period has expired or been lawfully terminated, the guest no longer has a legitimate expectation of privacy in the hotel room. Termination of a hotel tenant's occupancy rights for unauthorized activity is proper and "[h]otel management can terminate a guest's occupancy rights by taking affirmative steps to repossess the room." (Doc. 68.) Spicer's occupancy, argues the Government, was terminated when the Marriott's General Manager, Barr, re-keyed the room after learning of smoking and narcotics violations of hotel policy. And under this Circuit's precedent in *Allen*, Barr's action of re-keying the room was sufficient to divest Spicer of his status as an occupant of the room.

The Government argues that it is irrelevant that Spicer was present in the hotel room—much to the surprise of Barr—after the re-keying, because Barr had already taken the necessary affirmative steps to terminate Spicer's occupancy. Even if the initial re-keying failed to

accomplish the eviction, "any remaining privacy interest in the room was terminated when Spicer was asked to come into the hall, informed of the smoking violation and told that the hotel was taking back the room." *Id.*

Defendant argues that *Allen* is factually and legally distinguishable. The specifics of Defendant's argument will be discussed in greater length below, after this Court has summarized the *Allen* case.

In *Allen*, the defendant arrived at a motel, and paid for one night's lodging, plus a deposit for any telephone charges incurred. 106 F.3d at 697. The next morning, he tendered another night's lodging, but no deposit for telephone charges. *Id.* The motel clerk noticed that the Allen's balance had become insufficient as the result of telephone charges made. *Id.* The clerk called Allen and informed him that he needed to increase his balance, and Allen replied that he would do so shortly. *Id.* An hour passed, but Allen had not come down to the clerk's desk to pay his balance. *Id.* The clerk telephoned Allen again, but there was no answer, so the clerk alerted the motel manager as to the situation. *Id.*

The manager went to Allen's room and knocked on the door, but no one answered. *Id.* The manager assumed Allen had left the motel without paying, and used her manager's key to enter the room. *Id.* The room appeared empty, but the bathroom light was on, so the manager walked into the bathroom. *Id.* The manager observed large quantities of loose marijuana lying on a screen placed over the bathtub, stacks of marijuana packaged in brick form on the floor, and additional bricks lying in open dresser drawers. *Id.* The manager left the room, locked the door, and used a separate key to engage a "lock-out," which was a deadbolt lock only she could open. *Id.* The manager then called the police. *Id.* Once the officers arrived, the manager ushered them to Allen's room, unlocked the doors, and the officers viewed the room for about 15 seconds

before exiting.  *Id.*  The manager again re-engaged the "lock-out."  *Id.*  The officers used an adjoining room to "stakeout," and eventually apprehended Allen once he returned.  *Id.*  After obtaining a search warrant for the motel room, Allen's briefcase and automobile, Allen was ultimately charged with possession of cocaine with intent to distribute, possession of marijuana with intent to distribute, and possession of a firearm during a drug trafficking crime.  *Id.* at 698.  Allen moved to suppress the illegal drug evidence based on the officers' warrantless search.  *Id.*

The Government, relying on *Jacobsen*, argued that the police officers' search of Allen's room was legal because it did not exceed in scope the initial private search conducted by the motel manager.[3]  *Id.*  The Sixth Circuit, however, was "unwilling to extend the holding in *Jacobsen* to cases involving private searches of residences."  *Id.* at 699.  But the Court went on to explain "[t]hat the motel manager's search of Allen's room did not extinguish Allen's privacy interest in the room's contents, however, does not mean Allen's privacy interest was not extinguished through other means."  *Id.*  When the manager learned that Allen was keeping contraband in the motel room and locked Allen out of the room, she "divested Allen of his status as an occupant of the room and concomitantly terminated his privacy interest in its contents."  *Id.*  The manager, through private action, took possession of the room, and Allen could no longer assert a legitimate privacy interest in its contents.  *Id.*  Then, all that was needed to "avoid a constitutional infirmity" was the managers' consent to the officers' search of the room.[4]  *Id.*

---

[3] The manager's initial search of the motel room was not proscribed by the Fourth Amendment.  *Allen*, 106 F.3d at 698.  The Fourth Amendment prohibits only governmental action, and does not apply to searches, even unreasonable ones, conducted by private individuals who are not acting as agents of the government or with participation or knowledge of a government official.  *Burdeau v. McDowell,* 256 U.S. 465, 475 (1921); *United States v. Coleman*, 628 F.2d 961, 964–65 (6th Cir. 1980).

[4] There have been a number of cases in which courts have held that a police search of a hotel room was unlawful despite the fact that the officers received consent to search the room from a hotel employee.  *See Stoner v. State of California*, 376 U.S. 483, 489 (1964); *United States v. Jeffers*, 342 U.S. 48, 50 (1951);

(citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (a search conducted pursuant to valid consent is an exception to the Fourth Amendment's warrant requirement)). Allen's tenancy was "properly ceased, both because he was not allowed to store illegal drugs on the premises and because his pre-paid rental period had elapsed." *Id.*

The facts in *Allen* are very similar to the facts here. First, in *Allen,* the motel clerk alerted the motel manager that something was amiss because Allen owed the motel money and was not responding to the clerk's calls. *Id.* at 697. Here, the Marriott housekeeper smelled smoke and observed what she believed to be marijuana residue. She contacted her supervisor and the Human Resources and Accounting Supervisor, who, along with the Assistant Manager, contacted the General Manager after confirming the housekeeper's observations. Second, both the manager in *Allen* and the Marriott General Manager attempted to take possession of the rooms, after observing contraband by using master keys to lock the prior tenants out. The managers did not perform the lock-out or contract the police until they had observed illegal substances in the respective rooms. Finally, the officer or Detectives, both in *Allen* and here, respectively, conducted quick searches prior to obtaining warrants.

Defendant points to a number of nuanced facts in an attempt to argue that *Allen* is

---

*United States v. Bass*, 41 F. App'x 735, 737–38 (6th Cir. 2002). In each of these cases, however, the hotel employee did not take any action to divest the hotel guest of his or her privacy interest the room. *Stoner*, for example, is factually distinguishable. After pursuing a lead that an armed robber was staying at a certain hotel, the police went to the hotel and explained the situation to the night clerk, who then gave the police consent to search the room, and unlocked the room for the officers. *Stoner,* 376 U.S. at 484–86. The officers then "made a thorough search of the room and its contents" without a warrant, which the Supreme Court later held was a violation of the defendant's Fourth Amendment rights. *Id. Jeffers* is also distinguishable because after a hotel detective received a lead that there was "some stuff stashed" in a room, the detective contacted the police who proceeded to conduct a detailed search of the room, without a warrant, after receiving a key from the assistant manager of the room. 342 U.S. at 50. Finally, in *Bass*, this Circuit held officers, "[w]ithout knowledge, actual or implied, that Bass had been evicted from the hotel . . . could not reasonably rely on the hotel manager's consent in entering Bass's hotel room." 41 F. App'x at 737–38.

distinguishable. For example, Spicer argues that when the manager took possession of Allen's room, Allen had breached the motel agreement by providing insufficient funds to cover the cost of the room and telephone charges. But this distinction has no merit because the *Allen* Court made clear that the motel manager had the right to terminate Allen's occupancy not only because he had failed to pay the fees due, but also because Allen was using the room for illegal activities. *Id.* at 699.

Defendant also argues that Spicer's privacy interest was never extinguished because the re-keying of the room was unsuccessful, and Spicer returned to the room before Barr arrived with the Detectives. Admittedly, this fact does create a wrinkle in what has, so far, been a straight-forward *Allen* analysis. Yet, this Court sees no reason why the Defendant should receive a windfall because of a mechanical defect in a hotel key card. After searching the room and finding marijuana in violation of hotel policy, Barr thought he was performing a "lock-out," like the manager in *Allen*, by re-keying the room. Barr testified that he was genuinely surprised to find Spicer in the hotel room when he returned with the Detectives.

A result similar to *Allen* was reached in *United States v. Cunag*, where after suspecting a tenant had committed credit card fraud to purchase a hotel room, the hotel manager locked the guest out of the room and notified the police. 386 F.3d 888, 890 (9th Cir. 2004). When the officers arrived, the "manager discovered someone was in the room even though the occupants had been locked out." *Id.* When the manager knocked on the hotel room door with the officer, and the room appeared to be smoke-filled, the officers conducted a sweep and found evidence that the defendant had been smoking methamphetamine. *Id.* In affirming denial of the defendant's motion to suppress, the Court held that despite the fact that the defendant and his cohorts had somehow regained entry to the room, the manager had "took justifiable affirmative

steps to repossess room 320 and to assert dominion and control over it."  *Id.* at 895.

Therefore, this Court holds that the General Manager of the Marriot did, in fact, have the authority to consent to the police search of Spicer's room under *Allen* because the General Manager locked Spicer out of the room, extinguishing his privacy interest in the room.

<u>2. Protective Sweep</u>

Although it is unnecessary given this Court's finding that Barr had authority to consent to a police search of Defendant's room, this Court also finds that the Detectives were warranted to conduct a protective sweep under *Maryland v. Buie*, 494 U.S. 325 (1990).  The Government argues that the "principle of the protective sweep has been extended to instances where officers want to ensure the safety of officers left behind to secure the premises while the search warrant is obtained," (Doc. 68), and that the protective sweep conducted by the Detectives was permissible here because the sweep was short in duration and conducted to ensure no other individuals were present in Spicer's hotel room.  Defendant contends that it was impossible that Detectives actually believed someone else was in the room after Spicer had been detained "where the sole basis of the actions of the hotel employees and the police was 'their beliefs' that the room was vacant and abandoned."  (Doc. 69.)  Defendant also argues that the Detectives would not have allowed Barr to accompany them into the hotel room if they believed that there was an armed and dangerous person in the room.

The Supreme Court in *Buie* explained that "[a] 'protective sweep' is a quick and limited search of the premises, incident to an arrest conducted to protect the safety of police officers or others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding."  494 U.S. at 327.  The Court also made clear that "there must be articulable facts which, taken together with the rational inference from those facts, would warrant a

reasonably prudent officer in believing that the area to be swept harbors an individual posing a

danger to those on the arrest scene." *Id.* at 334.

In *Buie*, several officers had gone to the defendant's home with an arrest warrant, and

arrested the defendant inside of the home. *Id.* at 328. After the defendant emerged from the

basement and was detained, one of the officers went into the basement, to see if anyone else was

down there. *Id.* While performing a sweep of the basement, the officer observed a piece of

evidence linked to the defendant's crime in plain view and seized it. *Id.* The Supreme Court

upheld the search as a protective sweep. *Id.*

In *United States v. Taylor*, this Circuit held that officers were justified under the Fourth

Amendment in conducting a protective sweep of an apartment while a search warrant was being

obtained. 248 F.3d 506 (6th Cir. 2001). After being let into the apartment of the defendant—

who was suspected of dealing drugs and selling illegal weapons—by the defendant's brother and

observing a marijuana stem on the coffee table, officers secured the premise and found the

defendant crouching, fully-clothed in the bathtub behind the shower curtain. *Id.* at 510–511.

The Court held the protective sweep was justified under the circumstances:

> We think that it follows logically that the principle enunciated in *Buie* with regard
> to officers making an arrest-that the police may conduct a limited protective
> sweep to ensure the safety of those officers-applies with equal force to an officer
> left behind to secure the premises while a warrant to search those premises is
> obtained. We emphasize, however, that the purpose of such a protective sweep is
> to protect the safety of the officer who remains at the scene, and for that reason,
> the sweep must be limited to a cursory search of the premises for the purpose of
> finding persons hidden there who would threaten the officer's safety.

*Id.* at 513–14. This Circuit has also extended these principals to the situation where officers

conduct a protective sweep of a motel or hotel room. *See United States v. Biggs*, 70 F.3d 913,

916 (6th Cir. 1995) (protective sweep of motel room was permissible based on concerns that the

officers had received information that another person may be meeting the defendant at the motel, despite the fact that the defendant was arrested outside of the room at his truck); *United States v. Beasley*, 199 F. App'x 418, 422–23 (6th Cir. 2006) (finding that 15-second protective sweep of hotel room was justified to "make sure other armed persons were not hiding behind beds or in the bathroom area," even though the defendant had been arrested in the parking lot outside).

This Court finds that the Detectives' protective sweep of Spicer's hotel room was warranted. Detective Dozer testified that: "We just went in, took a quick look in the bathroom and checked under the beds and just made sure that there was no other individuals in there that possibly the hotel employees had missed when they were in there." (Doc. 57, p.7.) The Detectives and Bar also testified that they were in the room for two minutes at most. The Detectives had been informed, prior to entering the room that hotel employees, including the General Manager, had observed a large amount of contraband in the room, and it was reasonable for the Detectives to assume that there could be someone hiding in the room that was a danger to the officers and other hotel guests.

Defendant argues that it was impossible for the Detectives to believe that someone was present in the room given the fact that the hotel employees were under the impression the room was vacant. This argument is unpersuasive. Spicer somehow had made it back into the room despite Barr's effort to re-key the room, and a cohort of Spicer's could have done the same. Defendant's argument that the Detectives could not have reasonably believed that someone else was in the room given the fact that they allowed Barr to follow them into the room is more persuasive. Nevertheless, Detective Dozer's testimony merely suggests that Barr "escorted" the Detectives into the room for the purpose of "mak[ing] sure there was nobody else in the room" by unlocking the door. The testimony does not suggest that Barr participated in the actual

sweep of the room conducted by the Detectives.

This Court concludes that the Detectives were justified in conducting a protective sweep of Spicer's room prior to leaving to obtain a warrant under *Buie*.  It was reasonable for them to believe that another individual, posing a dangerous threat, was present in a room with approximately three kilograms of cocaine sitting in a backpack on the desk chair.

## IV. CONCLUSION

For the reasons above, this Court **DENIES** Defendant's Motion to Suppress Physical Evidence.

**IT IS SO ORDERED.**

**s/ Algenon L. Marbley**
**Algenon L. Marbley**
**United States District Judge**

**Dated: April 16, 2012**